## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD STOCKTON,                      :
                                      :
          Plaintiff                   :
                                      :        CIVIL NO. 1:16-CV-0613
     v.                               :
                                      :        (Judge Caputo)
JOHN WETZEL, *et al.,*                :
                                      :
          Defendants                  :

## M E M O R A N D U M

Plaintiff, Ronald Stockton, an inmate formerly housed at the Smithfield State Correctional Institution (SCI-Smithfield) in Huntingdon, Pennsylvania, filed this civil-rights action pursuant to 42 U.S.C. § 1983, asserting two Eighth Amendment claims against various Pennsylvania Department of Corrections employees.[1] Mr. Stockton's claims that on December 20, 2013, Defendants Corrections Officer (CO) Barndt, CO Harpster, CO Parks, CO Willinsky, CO Wilson and Lt. Bard assaulted him when he exited his Restricted Housing Unit (RHU) cell after his cell door was mysteriously opened.[2]  Following the assault, he claims Nurse Houck denied him medical treatment for his injuries.  (ECF No. 33.)

Presently before the Court is Defendants' properly supported motion for summary judgment with supporting brief, statement of undisputed facts and exhibits.  (ECF No. 95, 96, 97, and 98.) Plaintiff has filed multiple opposition briefs, answers to Defendants'

---

[1] Mr. Stockton is currently housed at SCI-Houtzdale.

[2] On March 26, 2018, pursuant to a joint stipulation, the parties dismissed Sergeant Timothy Miller as a Defendant.  *See* ECF No. 65.

statement of material facts and exhibits. (ECF Nos. 102, 103, 104, 110, and 111.) Defendants' have filed a Reply and a Court sanctioned Supplemental Reply. (ECF Nos. 105 and 112.)

On summary judgment Defendants argue that: (1) Mr. Stockton's excessive use of force claim is barred by the holdings in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Jacobs v. Bayha*, 616 F. App'x 507 (3d Cir. 2015) following his criminal conviction for aggravated assault of CO Willinsky during the December 2013 altercation; (2) Nurse Houck was not deliberately indifferent to Mr. Stockton's medical needs that day; (3) Defendants are entitled to qualified immunity; and (4) Mr. Stockton failed to exhaust his administrative remedies against CO Harpster and Nurse Houck. (ECF No. 98.) Contrary to Defendants' assertions, Mr. Stockton argues that his criminal aggravated assault conviction for striking CO Willinsky does not bar his excessive use of force claim and that the force Defendants used against him was excessive for the situation. He claims to have properly exhausted his administrative remedies against all Defendants either through a misconduct, grievance, or the inmate abuse allegation policy. As for Nurse Houck, he claims "the blood pouring down [his] face clearly shows that Plaintiff needed some form of treatment" yet she did not examine his injuries or provide him with any treatment. (ECF No. 111 at 3.) The motion is fully briefed and ripe for disposition by the Court.

The Court will grant in part and deny in part the Defendants' motion for summary judgment. As there are genuine issues of material fact whether Defendants used excessive force to subdue Mr. Stockton prior to transporting him to the strip search cell, Defendants' motion will be denied with respect to CO Park, CO Barndt, CO Harpster, CO

Willinsky, CO Wilson, and Lt. Bard.  Summary judgment will be entered for Defendant Houck with respect to Mr. Stockton's Eighth Amendment claim against her.  This matter will be set for trial at the convenience of the Court.


II.    **Summary Judgment Standard of Review**

Summary judgment is appropriate if, after reviewing the entire record in a case, the court is satisfied that no genuine issues of material fact exist, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  (*Id.*)  Issues of fact are "material" only if establishment of such facts might affect the outcome of the lawsuit under the governing substantive law.  (*Id.*)

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  *Santini v. Fuentes*, 795 F.3d 410 (3d Cir. 2015).  If this burden is met, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (citation and internal quotation marks omitted).  Rather, the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citing Fed. R. Civ. P.

56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### III.    Statement of Undisputed Facts

The following facts are undisputed or, where disputed, reflect Mr. Stockton's version of the facts, pursuant to this Court's duty to view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Forrest,* 930 F.3d at 105.

#### A.    Related Criminal Proceeding

On September 16, 2014, following a jury trial, Mr. Stockton was convicted of aggravated assault, 18 Pa. C.S. § 2702(a)(3).[3]  (ECF No. 96-2.)  Specifically, a jury convicted Mr. Stockton of assaulting CO Willinsky on December 20, 2013 in SCI-Smithfield's RHU.  (ECF No. 96, Defs.' Statement of Material Facts (DSMF) at ¶ 20; *see also* ECF No. 96-3 at 2.)  On November 13, 2014, Mr. Stockton received a sentence of 27 to 100 months' confinement to run consecutively to any sentence he was serving at that time.  *Commonwealth v. Stockton,* CP-31-CR-0254-2014 (Huntingdon Cty. Ct. Com. Pl.)(docket sheet).[4]

---

[3]  A person is guilty of aggravated assault if he "attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees, or other persons in subsection (c), in the performance of duty."  18 Pa. C.S. § 2702(a)(3).  Section (c)(9) extends this coverage to, *inter alia*, an "officer or employee of a correctional institution" such as CO Willinsky.

[4]  *See https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-31-CR-0000254-2014&dnh=pWvIvvJ4R6yS41wB6A%2bz6g%3d%3d* (last visited September 26, 2019).

Mr. Stockton, represented by counsel, did not testify at this criminal trial. (ECF No. 96-3.) CO Park, Lt. Bard, CO Willinsky, CO Barndt, CO Wilson, CO Harpster all testified, under oath, at the criminal trial. (*Id.*)

CO Park testified that he was working in the K Block control bubble on December 20, 2013. He mistakenly remotely opened Mr. Stockton's and another inmate's RHU cell doors that day. (*Id.* at 16.) CO Park opened the control bubble window and verbally ordered both RHU inmates to return to their cells. (*Id.*) Only Mr. Stockton came out of his cell. (ECF No. 96-5 at 4.) Mr. Stockton then returned to his cell, donned his jumpsuit, and came out of his cell. (*Id.*)

CO Park notified area officers and Lt. Bard that Mr. Stockton was out of his cell. (ECF No. 96-3 at 19.) Lt. Bard ordered Mr. Stockton to return to his cell. (*Id.* at 23.) CO Willinsky also ordered Mr. Stockton to return to his cell. (*Id.* at 31; DSMF at 22.) As CO Willinsky approached Mr. Stockton, he ordered Plaintiff to face the wall and place his hands behind his back. CO Harpster recounted hearing Mr. Stockton say "Fuckin' make me go in." Mr. Stockton ignored the order and took a defensive stance as CO Willinsky approached and punched the officer in the head. (ECF No. 96-3 at 17, 30 and 49; DSMF at 23.) Mr. Stockton threw multiple closed fist punches at CO Willinsky, many of them landed on his head and neck. (ECF No. 96-3 at 32; DSMF at 24.) Other officers arrived and attempted to subdue Mr. Stockton by striking him. Mr. Stockton continued to be combative and kick. (ECF No. 96-3 at 24, 32 and 50.) After additional officers responded, they assisted in getting Mr. Stockton to the ground and secured him in handcuffs. (*Id.* at 42.)

**B.      The Escort Video**

This video does not capture the events of December 20, 2013, in SCI-Smithfield's RHU prior to prison staff applying leg shackles and a tether to an already handcuffed Mr. Stockton.  The 34-minute video depicts the process of escorting Mr. Stockton off the RHU tier to the unit's strip search cell, his strip search, an encounter with Nurse Houck and his transfer back to his RHU cell.  *See* ECF No. 96-4, Attach. A.  Mr. Stockton claims Defendants ceased their assault once the video camera arrived on the scene.

The video commences with Mr. Stockton, who is wearing an orange jumpsuit, face down on the floor of the tier surrounded by several staff members.  As the officers applied the leg shackles and tether to Mr. Stockton, a small spot of blood from his right index finger is visible on the back of his jumpsuit.  Less than a minute later a staff member makes a radio request to call "medical."  Five staff members escort Mr. Stockton from the top tier of the RHU to the stairwell.  One staff member, holding the tether, leads Mr. Stockton who walks backwards and bent at the waist, to the staircase.  Another staff member stands in front of Mr. Stockton while two officers flanked either side of Mr. Stockton hold his arms.  One officer supervised the process and gave verbal directions to the other officers and Mr. Stockton.  Staff tell Mr. Stockton he must go to the strip search cell.  Staff permit Mr. Stockton to stand up, face forward and walk down the steps. Still escorted by staff, Mr. Stockton remains upright as he walks off the unit without incident or assistance.  Mr. Stockton does not attempt to physically resist the process. Staff do not push, pull, shove, or strike Mr. Stockton during this process.  Mr. Stockton and staff pass through at least two secure doors prior to reaching the strip search area without incident.  Mr. Stockton did not appear confused, disoriented, or clumsy as he

walked backward off the tier or down the steps.  No blood is visible on his face or the front of his jumpsuit.

Some members of the escort team depart while others place Mr. Stockton in the strip search cell, direct him to get on his knees and remain there while staff exit the strip cell.  Staff remove his leg shackles and hand cuffs without incident.  Once secured in the cell, Mr. Stockton stood up, faced the camera, and stood next to the back wall of the cell.  Mr. Stockton flexed the fingers on his right hand and wiped his hand of the front of is jumpsuit.  After standing silently for four minutes, Mr. Stockton calmly told the cameraman "Sorry, (inaudible), I need to call the abuse hotline" as he visually examined his right hand. The officer responds "Alright."  Mr. Stockton resumes standing face forward and leaning against the back of the cell.  He continues to occasionally wipe his right hand on his jumpsuit.

Eleven minutes into the video, Nurse Melissa Houck enters the strip search area. The camera operator tells Nurse Houck she may have to wait to examine Mr. Stockton "until they are done feeding."  Mr. Stockton continues to silently stand against the back wall.

Twelve and a half minutes into the video someone off camera enters the area and states that "he just assaulted staff".  Mr. Stockton responded that he did not assault staff, but that staff assaulted him while he was in handcuffs.  He voiced that Level 5 housing security procedures prohibit the opening of his cell door unless he is in cuffs.  He stated his cell door opened and that he was backing up when staff attacked him.  He also said that he was not supposed to be in the RHU as his disciplinary sentence expired.

Staff asked Mr. Stockton if he would comply with a strip search so medical could photograph him. He stated that no pictures, other than of his face, were necessary. Staff explained that DOC policy required Nurse Houck to take a minimum of four pictures of him. Mr. Stockton initially refused to allow medical to take any pictures of his body other than his face because "that's the only marks I have on my body, is on my face." Although Mr. Stockton states "I ain't got no marks on my body to do no strip search," he does not verbally refuse to be strip searched.

Mr. Stockton removed his jumpsuit, t-shirt, socks, and shoes without assistance and handed them to the officer for inspection. He then removed his undershorts and followed the officer's verbal instructions for the remainder of the visual strip search. Mr. Stockton easily and quickly turned his head to both sides, bent his neck, bent over at the waist, moved both arms in front of him as well as above his head. He turned around and stood on alternating feet without wobbling or losing his balance. An officer returned his undershorts to him and he put them back on.

Nurse Houck returned to the area. Mr. Stockton again told officers he would only allow her to photograph his face. An officer commented that Mr. Stockton's "knuckle [was] bleeding." Mr. Stockton said, "I'm not worried about that." Nurse Houck told Mr. Stockton that she must take four pictures of him: top, bottom, front and back. He said, "you just got to take pictures of anything that got hurt." He said he was not refusing to take the pictures but telling staff "where my injuries are."

Eighteen minutes into the video, staff ordered Mr. Stockton to back up to the cell door so staff could reapply his handcuffs before Nurse Houck entered the cell. At first Mr. Stockton refused and agreed to allow only pictures of his face because "you don't see no

marks on my body". Staff repeated the order for Mr. Stockton to put his hands through cell door slot to allow staff to apply the handcuffs. Mr. Stockton continued to argue with staff. Nurse Houck asked him if he was giving up his right to claim injuries from the incident. Mr. Stockton responded that he had injuries to his right shoulder and face. After a period of argument, Mr. Stockton agreed to be handcuffed but pulled away from officers when he thought Nurse Houck was taking pictures of his hands. Eventually Mr. Stockton agreed to allow staff to handcuff him. Officers then opened the cell door and entered the strip search cell accompanied by Nurse Houck. She took several photographs of Mr. Stockton, including his hands. Nurse Houck and the cameraman had an unobstructed view of Mr. Stockton during this process. Mr. Stockton also said his lip was injured. When an officer again noted that his hands were bleeding, Mr. Stockton said the blood belonged to someone else.

With Mr. Stockton facing forward, two small areas of swelling are visible on the front of his forehead; one about an inch over his left eyebrow and the other at his hairline on the outer portion of his left eyebrow. The video reveals several unobstructed views of his face and torso from the front and back. There is no visible bleeding from his forehead or the bridge of his nose. There are no visible injuries or swelling to his arms, chest, ribs or back. Nurse Houck asked him "if anything hurt?" Mr. Stockton replied "yeah, my face." Nurse Houck then asked him if he had any blurred vision. He said, "a little bit." Nurse Houck then instructed him to wash the injured area with soap and water when he returned to his cell. She also told him she would see about getting him some ice for his injury. Twenty-four minutes into the video, Nurse Houck left the area.

Mr. Stockton then dressed without any difficulty.  His speech was clear, direct, and he did not appear disoriented or confused.  He asked the Sargent when he would get to use the abuse hotline.  He also said he did not get his meal yet.  Staff told Mr. Stockton he would get to use the phone to make his abuse hotline as well as his meal tray.

After Mr. Stockton returned to his cell, he continued to speak to the cameraman.  He recounted that his cell door was "mysteriously popped open."  He repeated that the video camera did not arrive on scene until after staff ceased their assault.   Other inmates were yelling to Mr. Stockton the names of COs Willinsky, Barndt and Wilson as being involved in the assault on him.

### C.    DOC's Grievance Policy, DC-ADM 804

The DOC's Administrative Directive DC-ADM 804 (DC-ADM 804) is known as the Inmate Grievance System.   *See* www.cor.state.pa.us, DOC Policies, DC-ADM 804, Inmate Grievance System Policy; *see also* ECF No. 96, Defs.' Statement of Material Facts (DSMF) at ¶¶ 1-4.) The three-tiered grievance serves as an inmate's administrative remedy to address a DOC or facility action or policy that has affected them.  (*Id.* at ¶ 5.) A Grievance Coordinator initially reviews the grievance.  If dissatisfied with the initial grievance response, the inmate may appeal the decision to the Facility Manager (Superintendent) or designee.  Upon receiving a decision from the Superintendent, the inmate may file an appeal with the Secretary's Office of Inmate Grievances (SOIGA) for final review.  (*Id.* at ¶¶ 5 - 6.)

The grievance policy sets forth several requirements for inmate grievances.  All grievances must be submitted to the Grievance Coordinator within 15 working days after

the event upon which the claim is based, must not exceed two written pages and "shall include the date, approximate time and location of the event(s) that gave rise to the grievance" and "shall identify [the] individuals directly involved in the event(s)." (*Id.* at ¶ 7-8.) The inmate must also "specifically state any claims he/wishes to make concerning violations of Department directives, regulations, court orders, or other law." (*Id.* at ¶ 8.) The Grievance Coordinator assigns the grievance a tracking number and enters the grievance, even if rejected, into the Automated Inmate Grievance Tacking System. (*Id.* at ¶ 10.) Inmates seeking to appeal either the Initial Review Response or rejection must do so within 15 days from its receipt. (*Id.* at ¶ 11.) The inmate's appeal to the Facility Manager must include the reasons for the appeal. Only issues raised in the Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed to the Facility Manager. (*Id.* at ¶ 12.) An inmate dissatisfied with the Facility Manager's decision may file an appeal for final review with SOIGA. (*Id.* at ¶ 14.) Along with the written appeal to SOIGA, the inmate must provide SOIGA with a copy of the initial grievance, Initial Review Response, appeal to the Facility Manager, and Facility Manager's response. (*Id.* at ¶ 16.) SOIGA will either uphold the response, uphold the inmate, dismiss, uphold in part/deny in part, or remand the grievance for further response or review. (*Id.* at ¶ 17.)

### D.     Grievance Nos. 49066-13 & 491051-13

Mr. Stockton filed Grievance No. 490666-13 concerning the December 20, 2013 use of force event to final review. (*Id.* at ¶ 18; *see also* ECF No. 96-1 at 80 – 87.) He filed the grievance on December 20, 2013. Mr. Stockton asserts CO Willinsky, CO

Barndt, CO Wilson, Lt. Bard and Sgt. Miller attacked him. (*Id.*) He states he "was kicked and punch[ed] profus[ely] in the facial area. The blood from a wound of the left side of my forehead was cleaned by an inmate, and a staff member who [...] did not take pictures of the crime scene". (*Id.*) Mr. Stockton fails to name either Defendant Harpster or Nurse Houck in the grievance. (ECF No. 96 at ¶ 18-19.) On December 27, 2013, the Facility Grievance Coordinator notified Mr. Stockton she received an extension of time to reply to his grievance while staff investigated his allegations of abuse in accordance with DC ADM 001. (ECF No. 96-1 at 81.) On March 29, 2014, prison officials denied Grievance No. 490666-13. (*Id.* at 82.) Prison staff and the Pennsylvania State Police sought to interview Mr. Stockton during their investigations, he declined both requests. (*Id.*) Mr. Stockton filed an appeal to the Facility Manager on April 3, 2014. (*Id.* at 83 - 84.) He did not reference CO Harpster or Nurse Houck in the appeal. (*Id.*) Superintendent Fisher denied the appeal on April 15, 2014. (*Id.* at 85.) Mr. Stockton filed a timely appeal to SOIGA. (*Id.* at 86.) Mr. Stockton again does not mention either CO Harpster or Nurse Houck in his appeal. (*Id.*) The Chief Grievance Officer denied the appeal on June 3, 2014. (*Id.* at 87.) The Chief Grievance Officer noted that "[t]he investigation determined that your allegations against staff were not substantiated and no abuse was established." (*Id.*)

On December 27, 2013, Mr. Stockton filed Grievance No. 491051-13 concerning the medical care he received following the December 20, 2013 use of force event. In that grievance he references Nurse Melissa (Nurse Houck) and Nurse Jackie. (ECF No. 104 at 4 and ECF No. 105-1 at 6.) Mr. Stockton reported "pictures were taken by Nurse Melissa, and a blood test was performed by nurse Jackie, which was deeply appreciated." He stated that pictures and a blood test "was not the only treatment that should have been

administered.  With the lumps in my head and I may have had several concus[s]ions."
He requested an x-ray.  (ECF No. 105-1 at 6.)  Staff denied the grievance on January 10,
2014.  The responding Corrections Health Care Administrator noted that Mr. Stockton
was seen by a second nurse, RN Cutler, the same day, at his cell, who reported Mr.
Stockton "only had a superficial abrasion above his left eye and no further injuries noted
or reported by inmate Stockton.  Inmate Stockton had lab work drawn" at that time.  (*Id.*
at 7.)  A medical staff member gave Mr. Stockton the results of his blood test on January
2, 2014 and that staff ordered a facial x-ray.  (*Id.*)  Mr. Stockton filed an appeal to the
Facility Manager on January 21, 2014.  Mr. Stockton claims that pictures taken on the
day of the assault will show that his "lip was busted, forehead opened, with a mark on
[his] eye."  (*Id.* at 8.)  He also claims he told the nurse "that [he] was experiencing
headaches, dizzy spells, etc., in which she told [him] to keep the wound on his head clean
and that she will send ice which [he] never received."  (*Id.*)  He also notes he was seen
by a member of the medical staff on January 10, 2014. (*Id.*)  The denial of the grievance
was upheld on January 31, 2014.  (*Id.* at 9.)  Mr. Stockton did not submit an appeal to
SOIGA.  (*Id.*, Shambaugh Decl. at ¶ 8.)


### E.    DC-ADM 001, Inmate Abuse Investigation[5]

The initial response to Mr. Stockton's abuse grievance, Grievance No. 490666-13,
was delayed pending the investigation of his abuse allegations pursuant to DC ADM 001.
(ECF No. 96-1 at 81.)  The investigator assigned to review the matter reviewed "DC-121

---

[5] The Court takes judicial notice of DC-ADM 001 which is the is the DOC's Inmate Abuse
Policy.  It is available on-line at the DOC's public website.  *See* https://www.cor.pa.gov.  (Search:
About Us; DOC Policies;001 Inmate Abuse) (last visited September 26, 2019).

reports, grievance submitted by Stockton, Abuse hotline complaints and review of the DiBos video system". (ECF Nos. 58-1 at 6-104 and 105-2 at 2 – 6.) The investigator sought to interview nine inmates and nine staff members. (*Id.*) Mr. Stockton refused to participate in the investigation process. (*Id.* at 6.) On December 20, 2013, all involved officers (CO Willinsky, CO Kennedy, CO Park, CO Wilson, CO Barndt, Sgt. Miller and Lt. Bard), including CO Harpster filed a DC-121, Employee Report of Incident, following his involvement in the use of force event. (ECF 33-1 at 14.) CO Harpster sustained an injury to his left hand during the incident. (*Id.*) During the course of the investigation, several of the Defendants acknowledged striking Mr. Stockton while he resisted staff. Several inmates reported witnessing staff assault Mr. Stockton. (ECF No. 58-1 at 6 - 7.)

The investigation was unable to substantiate Mr. Stockton's allegations. (*Id.* at 7.) "[A]ction that occurred in the corner of the tier are undeterminable due to the positioning of the camera". (*Id.*) However, the investigator concluded that:

> It is believed that inmate Stockton had every opportunity to go back into his cell and close the door. He made a conscious decision to walk back into his cell, put his orange jumpsuit on, come back on the tier, sits on the steps and waits for staff, then got up and closed his door and remained on the tier. When given orders to go back to his cell, he refused and then started to assault officer Willinsky. Staff responded in an appropriate manner and used the amount of force necessary to restrain the inmate.

(*Id.*)


**F.      Nurse Houck's Medical Evaluation of Mr. Stockton following the December 20, 2013 Use of Force Event.**

Within ten minutes of staff placing Mr. Stockton in restraints, Nurse Houck reported to the strip search cell where Mr. Stockton was held. (ECF No. 96, Ex. D, Attach. A.) The

strip search cell has wire grating which allows for visual observation of the occupant. Initially, Mr. Stockton reported he only had injuries to his face, and no other marks on his body.  However, he later reported an injury to his lip and right shoulder.  (*Id.*)  When questioned as to the blood on his hands, Mr. Stockton reported "that's not my blood, it's someone else's".  (*Id.*; *see also* ECF No. 96-7.)

Nurse Houck completed a Medical Incident/Injury Report following her evaluation of Mr. Stockton.  (ECF No. 58-1.)  She noted Mr. Stockton was argumentative during the assessment and had superficial laceration and hematoma on his forehead above his left eye and that Mr. Stockton denied any serious injuries.  (*Id.*)  Nurse Houck advised Mr. Stockton to wash his forehead with soap and water when he was returned to his cell.  (*Id.*) She noted sick call as needed as follow-up.  (*Id.*)  She told him she would try to send some ice to him.  (ECF No. 96, Ex. D, Attach. A.)  Mr. Stockton never specifically asked Nurse Houck for any type of treatment.  (ECF No. 96-5 at 9.)

In his grievance, Mr. Stockton claimed Defendants assaulted him from 10:30 a.m. to 1:30 p.m.  (ECF No. 58-1 at 54.)  He was "kicked and punched profusiely (sic) in the facial area."  (*Id.*)  He claims "blood from a wound of the left side of [his] forehead" was cleaned from the "crime scene" and the area was not photographed to preserve the evidence.  (*Id.*)

During his deposition Mr. Stockton reported that the blood on his hands was from his own forehead.  (ECF No. 96-5 at 9.)  He also reported that staff kicked him in the chest, the bridge of his nose and head.  He wanted Nurse Houck to clean his wounds and let him see a doctor.  (*Id.*)  This is because his "head was swelled" and he "could have suffered concussions".  (*Id.*)  He testified that when Nurse Houck saw him his "forehead

was split and [he had] a few marks," but the next day "both [his] eyes black and all that."
(*Id.* at 10.)

On December 20, 2013, once returned to his cell, "Nurse Jackie" (RN Cutler) came to his cell and drew his blood. (ECF No. 105 at 6 - 7.) Plaintiff requested an x-ray on December 25, 2013. (*Id.* at 8.) Staff told him to fill out a sick call request. (*Id.*) Two weeks later, on January 9, 2014, Mr. Stockton filled out a sick call request and was seen the following day. (*Id.*) A facial x-ray was ordered and performed. (*Id.* at 7.)

## IV.    Discussion

### A.    Mr. Stockton's Aggravated Assault Conviction Does Not Preclude his Eighth Amendment Excessive Use of Force Claim

The United States Supreme Court has held that a plaintiff may not recover damages under § 1983 if doing so would imply the invalidity of a prior criminal conviction. *Heck, supra.* The Supreme Court explained that:

> [W]hen [an individual] seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the validity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed.

*Heck*, 512 U.S. at 487, 114 S.Ct. at 2372. The *Heck* doctrine does not create a *per se* bar to a claim of excessive force even where the plaintiff was previously convicted of resisting arrest, assault, or similar crime arising out of the same incident. *Garrison v. Porch*, 376 F. App'x 274, 277-78 (3d Cir. 2010) (simple assault conviction did not bar

excessive force claim); *Lora-Pena v. FBI*, 529 F.3d 503, 506 (3d Cir. 2008) (resisting arrest and assault conviction did not bar excessive force claim); *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997) (resisting arrest conviction did not bar excessive force claim). The Third Circuit Court of Appeals has explained that where a "reasonable juror, considering the totality of the circumstances, could find that the arrestee resisted arrest" or assaulted the arresting officer, "but was still subjected to an unreasonable excessive level of force" by the responding officer, plaintiff's claim was not barred by *Heck. Garrison*, 376 F. App'x at 277-78 (citing *Nelson*, 109 F.3d at 146); *Lora-Pena*, 529 F.3d at 506.

Here, Mr. Stockton was convicted of assaulting CO Willinsky while in performance of his duty of returning Plaintiff to his RHU cell after he refused direct orders to do so and then resisted staff efforts to subdue him. In this case, Mr. Stockton alleges that more than the necessary amount of force was used to subdue him when responding to CO Park's call that he was out of his RHU cell. Under the facts presented in this case, there remains a possibility that a reasonable jury could find that the Defendants responded to Mr. Stockton's physical resistance to their efforts with excessive force, especially after CO Willinsky was assaulted. *Garrison,* 376 F. App'x at 277-78; *Lora-Pena*, 529 F.3d at 506; and *Nelson*, 109 F.3d at 146. Because this possibility is not foreclosed by Mr. Stockton's conviction for assault, a finding that Defendants used excessive force against Mr. Stockton when returning him to his cell would not necessarily imply the invalidity of Mr. Stockton's conviction for aggravated assault, and thus the *Heck* rule does not apply.

### B.    Excessive Use of Force Claim

When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment.  *Hudson v. McMillian,* 503 U.S. 1, 6 - 7, 112 S.Ct. 995, 997 - 99, 117 L.Ed.2d 156 (1992).    In determining whether the use of force is excessive, courts are instructed to examine: (1) the extent of the injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; and (4) whether the force was applied in a good faith effort to maintain and restore order.  *Brooks v.* Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quotation marks and citation omitted). As with any Eighth Amendment violation, Plaintiff must prove the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

Not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 - 10, 112 S.Ct. at 1000.  An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.  *Id.*  (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178, 175 L.Ed. 2d 995 (2010) (per curiam); *see also Hudson*, 503 U.S. at 7, 112 S.Ct. at 999. "[T]he extent of injury suffered by an inmate is one factor that may

suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins*, 559 U.S. at 37, 130 S.Ct. at 1178.

Mr. Stockton claims that a genuine issue of material fact exists as to whether Defendants used unreasonable force in violation of his Eighth Amendment rights. The Court agrees that, taking the facts in the light most favorable to Mr. Stockton, a reasonable jury could determine that Defendants used unreasonable force while detaining him on the top tier of the RHU on December 20, 2013.

Prior to the arrival of the video camera, Mr. Stockton and the Defendants have two vastly different accounts of what happened that day. Mr. Stockton contends that the Defendants, intentionally opened his cell door to create an opportunity to assault him due to prior grievances/lawsuits. He claims that although he was out of his cell, he was confined to a secure area (the RHU) and that all other inmates were locked in their cells. He argues that he did not pose a threat or security risk warranting the level of force used against him. He was "backing up" and non-combative when Defendants attacked him. Because he posed no immediate security threat, he argues that Defendants' failure to follow DOC policy and assemble as use of force team, which would have included the video recording of the entire event, demonstrates their malicious intent to assault him. In his deposition he suggests he did not initially return to his cell because the unit's cameras could not see what happens in his cell, therefore he wanted to meet the officers where Defendants' actions would be recorded. In contrast, Defendants contend CO Park accidently opened Mr. Stockton's RHU cell door. Various Defendants ordered Mr. Stockton to return to his cell but he refused. He came out of his cell, went back into his cell, dressed, and came out again and shut his cell door. He then proceeded to walk

around the tier.  When Defendants approached Mr. Stockton, he took a defensive stance, swung, and kicked at officers.  Defendants assert that Plaintiff's threatening words and aggressive manner warranted the force they used to subdue him.

At this point, taking the facts in a light most favorable to the non-movant, a reasonable jury could find Plaintiff's version of events credible and conclude that Defendants used excessive force in violation of the Eighth Amendment during the process of detaining him prior to the arrival of the camera on the unit.  The fact that Mr. Stockton assaulted staff during this altercation does not negate and is not inconsistent with the possibility that Defendants used excessive force against him.  The Court accordingly declines to grant summary judgment on Plaintiff's excessive force claim.

### C.    Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).  "The doctrine is designed to 'give[] government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law.' " *Bryan v. United States of Am.*, 913 F.3d 356, 362 (3d Cir. 2019) (quoting *City and Cty. of San Francisco, Cal. v. Sheehan*, _____ U.S. _____, _____, 135 S.Ct. 1765, 1774, 191 L.Ed.2d 856 (2015)); *see also Blackhawk v. Pa.*, 381 F.3d 202, 215 (3d Cir. 2004) (qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law."); *Pearson*, 555 U.S. at 231, 129 S.Ct. at 815 ("The

protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (citation and internal quotation marks omitted)). Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside the law." *Butz v. Economou*, 438 U.S. 506-07, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

At the summary judgment stage, when an official asserts qualified immunity, the district court must first determine whether, when viewed in the light most favorable to the plaintiff, the facts could support a jury finding that the defendants violated the Constitution. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). Next, the Court must determine whether such right was "clearly established" at the time of Defendants' actions. *Santini,* 795 F.3d at 417. These two inquiries need not be addressed in order; courts "are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. at 818. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, _____ U.S. _____, _____, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)). This means "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*.

Defendants argue they are entitled to qualified immunity on Mr. Stockton's claim of excessive force in violation of his Eighth Amendment rights because "Plaintiff attacked

the defendant officers. This necessitated use of force. As evidenced by his lack of serious injuries, the force was reasonable." (ECF No. 98 at 18.) Here, Mr. Stockton claims that Defendants kicked and punched him in the facial area prior to placing him in handcuffs and continued until the camera arrived on the unit. Even if Mr. Mr. Stockton assaulted at least one officer in the altercation, there exists a genuine issue of material fact as to the force Defendants used to subdue Mr. Stockton was excessive, and whether the officers' use of force ceased once he was in handcuffs. There exists a clearly established right to be free from physical abuse, reasonable officers would have understood in December 2013 that physically assaulting an inmate in restraints violated the Constitution. *See Giles v.* Kearney, 571 F.3d 318, 326 – 27 (3d Cir. 2009). To the extent Defendants argue that Mr. Stockton's lack of serious injuries demonstrates their use of "reasonable" force, the Court disagrees. "Injury and force ... are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38, 130 S.Ct. at 1178 - 79. Accordingly, the Court finds that Defendants are not entitled to summary judgment as to Mr. Stockton's excessive use force claim based on qualified immunity. In reaching this conclusion the Court is not making a finding that any of Mr. Stockton's allegations are true, and Mr. Stockton continues to carry the burden of proving them at trial.

### D.    Mr. Stockton's Exhaustion of his Available Administrative Remedies against CO Harpster and Nurse Houck

Under the Prison Litigation Reform Act (PLRA), a prisoner must pursue all available administrative remedies within the prison's grievance system before bringing a civil rights action concerning prison conditions in federal court.    *See* 42 U.S.C. § 1997(e)(a)*; Ross v. Blake*, _____ U.S. _____, _____, 136 S.Ct. 1850, 1855, 195 L.Ed.2d 117 (2016).   This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002).  Exhaustion is mandatory and must be "proper," which requires a prisoner to "us[e] all steps that the agency holds out, and [to do] so properly (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81 90, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006) (emphasis in original).  This means that the prisoner plaintiff must have completed "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.*  The "filing [of] an untimely or otherwise procedurally defective administrative grievance or appeal" does not satisfy the PLRA's exhaustion requirement.  *Id.*  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218, 127 S.Ct. 910, 923, 166 L.Ed.2d 798 (2007).  Failure to comply substantially with the procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim.  *Spruill v. Gillis*, 372 F.3d 218, 227 – 32 (3d Cir. 2004); *Robinson v. Supt. Rockview SCI*, 831 F.3d 148,

153 (3d Cir. 2016). "[P]risoners must complete the administrative review process in accordance with the applicable procedural rules, rules that are defined not by the PLRA, but by the prison grievance process itself.").

Applying this procedural default component to the exhaustion requirement, the Third Circuit Court of Appeals has held that:

> [a]s for the failure to identify named defendants on the grievance form, … to the extent the identity of a defendant was "a fact relevant to the claim," Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And, … in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA.

*Williams v. Pennsylvania Dep't. of Corr.*, 146 F. App'x 554, 557 (3d Cir. 2005). However, prison authorities may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits and found them wanting. *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where OPR fully examined merits of excessive force claim where prison officials may have interfered with grievance process).

### (i) CO Harpster

Here, it is undisputed that Mr. Stockton presented, and pursued, a grievance to final review that raised his excessive use of force claim arising from the events of December 20, 2013. It is also undisputed that his grievance, Grievance No. 490666-13, named Defendants CO Willinsky, CO Barndt, CO Wilson, and Lt. Bard as being involved with the assault. Mr. Stockton failed to name Defendant Harpster as being involved in

the use of force event, however, the parties do not contest CO Harpster's involvement in the use of force event. (ECF No. 96-1 at 80.) Defendants move to exclude CO Harpster from this action exclusively based on Mr. Stockton's failure to name him in his grievance.

It is clear that the DOC's grievance procedures "supply the yardstick" to determine whether Mr. Stockton has procedurally defaulted his claims under the PLRA when he omitted naming any Defendant in his grievance. *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill*, 372 F.3d at 231). However, contrary to Defendants' assertion, neither the DOC's grievance policy nor the PLRA requires a prisoner-plaintiff to name all perspective civil defendants in his prison administrative remedy. The United States Court of Appeals for the Third Circuit has repeatedly held that "[t]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he might be sued." *Williams*, 482 F.3d at 640 (quoting *Jones*, 549 U.S. at 219, 127 S.Ct. at 923); *see also Diaz v. Palakovich*, 448 F. App'x 211, 217 (3d Cir. 2011) (procedural default that may have resulted from failing to name prison officials in a fully exhausted grievance can be excused depending on the nature of the claim). Pursuant to the DOC's Grievance policy, allegations of abuse grievances "shall be handled in accordance with the Department policy DC-ADM 001." (ECF No. 96-1 at 56.) That is precisely what occurred with Mr. Stockton's Grievance No. 490666-13. (*Id.* at 81.) How the DOC learned of Mr. Stockton's abuse allegations, whether due to Mr. Stockton's telephone call to the abuse hotline, his grievance, or the involved staff reporting Plaintiff's allegation[6] of abuse, is irrelevant. All reporting mechanisms lead to

---

[6] Mr. Stockton, while detained in the strip search cell, in the presence of staff, asserted staff assaulted him. *See* Escort Video.

the same result, an investigation by the Office of Special Investigations and Intelligence (OSII). The depth and breadth of the investigation is clear. *See* ECF No. 58-1. The report lists the following information was available to the investigator: his interviews of involved staff members (CO Willinsky, CO Harpster, CO Kennedy, CO Park; CO Wilson; CO Barndt; Sgt. Miller, Lt. Bard) and several inmates; Grievance No. 490666-13; two videos; written statements by the involved staff; the Employee Report of Incident (DC-121 Part 3) written by each involved staff member (including CO Harpster) on the day of the incident; the medical incident/injury reports (and pictures) for each staff member injured (including CO Harpster) as well as Mr. Stockton; a copy of the misconduct issued to Mr. Stockton for assault. (*Id.*) Upon completion of the investigation, and based on the investigation, DOC staff provided an Initial Review Response to Grievance No. 490666-3. (*Id.* at 82.) "The outcome of the investigation could not substantiate your claims … your grievance is denied[,] and all staff actions were justified". (*Id.*) At final review, the Chief Grievance Officer noted that Mr. Stockton's allegation of abuse "was investigated by the Security Office staff and reviewed by the Office of Special Investigations and Intelligence … the investigation determined that your allegations against staff were not substantiated and no abuse was established." (*Id.* at 87.) The DOC's investigation of Mr. Stockton's abuse allegations encompassed the appropriateness of the actions of all staff involved in the use of force event, not just those named in Mr. Stockton's grievance. (ECF No. 58-1.) The Defendants argue that all claims against CO Harpster, who admits to using "strikes" (*Id.* at 63) to gain Mr. Stockton's compliance, was identified by other Defendants as being involved in the event (*Id.* at 61-76), and whom the OSII investigation found "[s]taff responded in an appropriate manner and used the amount of force

necessary to restrain the inmate" (ECF No. 58-1 at 7), should be dismissed because he was not named in the grievance, is over simplifying the administrative exhaustion requirement. Under the facts of this case, to bar suit against CO Harpster would "engender a prison grievance review culture marked by technicalities," *Spruill*, 372 F.3d at 235, defeating the objective of the PLRA, i.e. "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Nussle*, 534 U.S. at 524-25, 122 S.Ct. at 988. The identify of all staff that laid hands upon Mr. Stockton on December 20, 2013, were known to the institution. The investigation of Mr. Stockton's abuse allegations included the actions of all of the officers, not just those named in the grievance. The fact that Mr. Stockton was unable to provide the names of all the officers involved in the single event did not prevent the DOC from investigating the matter. Because the Chief Grievance Officer relied upon OSII's investigation to deny Mr. Stockton's abuse grievance finding that his allegations against staff "were not substantiated and no abuse established," the Court finds the issue of Plaintiff's failure to specifically name CO Harpster in the grievance waived. *See Camp*, 219 F.3d at 279.


      **(ii)**    **Nurse Houck**

Mr. Stockton argues that Nurse Houck, known to him as Nurse Melissa, was included in his abuse allegation complaint as well as Grievance No. 4910513. (ECF No. 103 and 111).

Unlike Mr. Stockton's abuse allegations, his allegations against Nurse Houck were not part of the OSII allegation of abuse investigation. The DC-ADM 001 investigation

- 27 -

addressed only his allegations of abuse by the corrections officers responding to return him to his RHU cell. This is not a situation where Mr. Stockton participated in the investigation and voiced his complaints concerning Nurse Houck's actions that day, broadening the scope of the investigation and prison officials ignored his claim. Neither Grievance No. 409666-13 (abuse allegations) nor the DC-ADM 001 investigation addressed his post-incident medical care.

Medical treatment received by an inmate is considered a prison condition. *Stewart v. Kelchner*, 358 Fed. Appx. 291, 296-97 (3d Cir. 2009). As previously noted, proper exhaustion of administrative remedies requires substantial compliance with the rules of the internal prison grievance process, which are defined by the prison, not the PLRA. *Jones,* 549 U.S. at 218, 127 S.Ct. at 922-23; *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013); *Spruill,* 372 F.3d at 231.

The record supports Mr. Stockton's assertion that he filed a timely grievance concerning his lack of medical care and it does mention Nurse Houck. To the extent it challenges the care Nurse Houck rendered, the complete exhaustion of the grievance is undetermined. (ECF No. 105-1 at 6.) The undisputed record reveals that Mr. Stockton was provided a timely initial response to his grievance on January 10, 2014. (*Id.* at 7.) Mr. Stockton then filed an appeal to the Facility Manager who issued a response on January 31, 2014. (*Id.* at 8 - 9.) Ms. Helen Shambaugh, a Grievance Officer with SOIGA, affirms that Mr. Stockton did not appeal the Facility Manager's determination to SOIGA. (*Id.* at 3.) Mr. Stockton counters he "exhausted grievance # 491051-13 to the highest level as shown by exhibit-g and had to mail the final appeal to central office by giving the mail to the same officer's in incident as Plaintiff did not have direct access to mail box in

the RHU at SCI-Smithfield." (ECF No. 111 at 4.) Exhibit G is a copy of Mr. Stockton's "Final Grievance Appeal #491051-13" dated February 5, 2014. (*Id.* at 13.)

When considering a motion for summary judgment, "a district court may not make credibility determinations or engage in any weighing of the evidence." *Paladino v. Newsome*, 885 F.3d 203, 209-10 (3d Cir. 2018) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)). Instead, "the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Id.* at 210 (quoting *Marino*, 358 F.3d at 247). Thus, in light of Mr. Stockton's assertions, there is a genuine factual dispute concerning whether Defendants failed to deposit Mr. Stockton's appeal to final review in the mail as he was confined to the RHU and could not do so himself, a dispute which is material to whether the administrative remedy process was available to him such that he could exhaust the claim against Nurse Houck.

### E.    Mr. Stockton's Eighth Amendment Medical Claim

The Eighth Amendment "requires prison officials to provide basic medical treatment" for those "incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L.Ed. 2d 251 (1976)). To establish an Eighth Amendment claim based on inadequate medical care, an inmate must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). A plaintiff must make both an "objective" showing that the deprivation was "sufficiently serious," as well as a "subjective" showing that the defendant acted with "a sufficiently culpable state of mind." *See Montgomery v. Pinchak*, 294 F.3d 492, 499

(3d Cir. 2002) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L.Ed. 2d 271 (1991) ).

Defendants argue that Nurse Houck is entitled to summary judgment because Mr. Stockton merely disagrees with her prescribed course of treatment and therefore no reasonable juror could find she was deliberately indifferent toward Plaintiff's medical condition. Mr. Stockton argues that his immediate involvement in an unplanned use of force event with several staff members, as well as his head and facial injuries, support a finding that Nurse Houck provided inadequate medical care with deliberate indifference in violation of his Eighth Amendment constitutional rights.

The record before the Court establishes that Mr. Stockton was non-cooperative during Nurse Houck's evaluation. She assessed him based on her encounter with him, his physical injuries, and verbal complaints. She adjudged his injuries to be minor and not requiring further immediate medical attention. She advised him to go through sick call procedures if he needed further care. While Mr. Stockton was unsatisfied with the care he received, his vague complaints of what care he wanted because he "could have had a concussion" fail to show that his Eighth Amendment rights were violated. *See generally Spruill*, 372 F.3d at 235 (explaining that "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation (alteration omitted) (quoting *Monmouth Cty. Corr. Institutional Inmates, v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987))). The undisputed record of Nurse Houck's encounter with Mr. Stockton, confirmed by Mr. Stockton's appearance, statements, demeanor, abilities, lack of physical inabilities, lead the Court to conclude that no reasonable juror could find Nurse Houck

was deliberately indifferent to his medical needs.[7]  Accordingly, summary judgment is warranted on this claim.

An appropriate order follows.


**Date:  September 30, 2019**                                         /s/ A. Richard Caputo
                                                                      **A. RICHARD CAPUTO**
                                                                      **United States District Judge**

---

[7] In cases where pertinent events are captured on video, courts should not rely merely on the parties' characterization of the events but rather should view the facts are they are depicted by the video.  *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).  If, viewing the evidence in the light most favorable to a plaintiff, no reasonable fact finder could view the video of the incident and determine that the defendants acted maliciously and sadistically, summary judgment is appropriate. *Tindell v. Beard*, 351 F. App'x 591, 596 (3d Cir. 2009).